# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 1, 2002

## STATE OF TENNESSEE v. CINDY GENTRY

**Direct Appeal from the Circuit Court for Dickson County**
**No. CR-5380    Robert E. Burch, Judge**

---

**No. M2002-00415-CCA-R3-CD - Filed March 14, 2003**

---

The defendant was convicted of aggravated assault, a Class C felony, and was sentenced by the trial court as a Range I, standard offender to three years in the Department of Correction, with the sentence to be suspended and the defendant placed on probation after one year in the county workhouse. She raises two issues on appeal: (1) whether the evidence was sufficient to support her conviction; and (2) whether the trial court erred in ordering that she serve one year of her sentence in the county workhouse. Based on our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

William B. Lockert, III, District Public Defender; and Christopher L. Young, Assistant District Public Defender, for the appellant, Cindy Gentry.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Kim G. Menke, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

At approximately 2:00 p.m. on Monday, October 2, 2000, the victim in this case, Danita McCord, was walking across the travel lanes of a shopping center parking lot in Dickson when she heard the sound of squealing brakes and looked up to see a small, white rental car driven by the defendant, Cindy Gentry, screech to a halt just short of hitting her. According to the victim, the defendant had threatened to kill her just a day or two before. She testified that on the immediately preceding weekend, the defendant and a woman named Shelly Blanks had come uninvited to her

home and that before they left, the defendant had told her, "I'm going to get you, you fucking bitch. You just wait, I'm going to kill you."[1]

Several witnesses, including the victim, attempted to describe the area in which the October 2, 2000, incident occurred. From their testimony, which was not altogether clear, it appears that the shopping center at issue is comprised of a line of stores, including a Kroger and a Dollar General, with large parking areas in front of the buildings. Two travel lanes and a fire lane immediately in front of the buildings separate the parking areas from the store entrances. In addition, there are apparently small curb-enclosed areas of shrubbery, which the victim referred to as "medians," marking the borders between the parking areas and the travel lanes. The victim testified she paused at one of those "medians" to look in both directions for traffic before starting from the parking area to the Dollar General Store. She saw a light-colored vehicle by the Kroger, but it was a "far distance and it wasn't moving," so she stepped from the curb and proceeded to cross. She said she was about halfway across when she heard "tires squealing." When she "frantically started looking around," she saw what appeared to be the same vehicle she had just seen in front of the Kroger "right next to [her]" and the defendant exiting from the driver's side door. The victim testified she initially chose to move back to the median because the defendant had not completely exited from the driver's door and she was afraid she would step on the accelerator again. When the victim did so, the defendant started screaming, "Don't worry, I'm going to get you." At the same time, the victim said she was frantically screaming to the Dollar General Store employees that the defendant had just tried to kill her and to please call 9-1-1. The victim testified that the door to the Dollar General Store was open. When she noticed that the store's employees were paying attention to her, she hurried past the defendant's vehicle into the store and asked the manager to call the police. At that point, the defendant sped away.

The victim testified she was familiar with the vehicle the defendant normally drove, which was "a black Jeep Grand Cherokee with gold pin striping and Kentucky plates." She later testified that she had not recognized the defendant as the driver of the small white car when she saw it stopped in front of the Kroger and that there had been nothing about the vehicle to draw her attention. She said she had been sure when she stepped from the curb that she had more than adequate time to cross the lanes safely and agreed that the defendant had to have accelerated quickly to reach her position. The victim was confident she would have been hit had the defendant not stopped the vehicle. She testified she was approximately in the center of the defendant's lane and that the car was possibly as close as six inches from her when it came to a complete stop. She said she was very scared throughout the incident and still had not completely recovered from the experience.

Dickson Police Officer David Cole, who responded to the report of the assault, testified that the victim was visibly upset, "crying," and "very agitated" when he arrived at the scene at

---

[1]The defendant apparently believed that the victim was having an affair with her husband. This information, however, was not imparted to the jury.

approximately 2:08 p.m.  Neither the defendant nor the vehicle was still there, but the victim told him that she had recognized the driver and provided him with the defendant's name.

Kathy Davis testified that she was working as a cashier at the Dollar General Store on the afternoon of October 2, 2000.  She said she was at her cash register at the front of the store, with her back to the door, when her attention was caught by the sound of a car's "screeching" brakes. Believing that someone had just been hit, she ran to the door, where she saw the defendant getting out of her vehicle and the victim crossing the lane headed toward the Dollar General Store, about to step up onto the sidewalk.  Davis testified that the victim was "near" the defendant's car, about halfway across the lane, when she first saw her, and that she heard the defendant twice scream to the victim that she was going to "kick [her] a-s-s."  The defendant then got back into her car and drove off.  At the same time that the defendant was screaming, the victim, who appeared to be "scared" and "in a frenzy," hurried into the store, telling the employees to call 9-1-1.

After the trial court denied her motion for judgment of acquittal, the defendant testified in her own behalf.  According to her testimony, she was driving a white Dodge Neon, which she had been renting for two weeks, at approximately twenty miles per hour through the parking lot with the intention of going to the Dollar General Store to get a sweatshirt.  She said she had just turned the corner to go to the Dollar General Store when the victim walked out in front of her vehicle.  Upon seeing her, she immediately slammed on the brakes, stopping the car four or five feet from the victim.  After first stepping backwards onto the curb, the victim then continued forward in front of her vehicle and up onto the opposite curb.  The defendant said she partially got out of the car at that point and yelled at the victim, but that she never completely exited the vehicle because her girlfriend, who was in the passenger seat, grabbed onto her shirt.  She emphatically denied that she had ever had the intent to scare the victim or run her over with her vehicle.

On cross-examination, the defendant testified that the victim was lying when she said she had seen her car in front of the Kroger because she had not driven past that store when she entered the parking lot.  She claimed she had been on the lookout for pedestrians, but had not seen the victim until she stepped out in front of her car as she was turning the corner.  Asked why she had told the victim that she was going to "kick her ass," the defendant replied, "Because I wanted to," but said that she would not have done it right then.

Two witnesses testified at the defendant's sentencing hearing:  Jeff Walden, the probation officer who prepared her presentence report, and the defendant.  Walden testified that the defendant's official version of the incident was that the victim was dating her husband and had fabricated the allegation to try to help him gain custody of their children.  Walden said the defendant gave him no indication of anything specific having happened on the day of the incident to provoke her and, in fact, denied that the incident had occurred.

The defendant testified she had other charges pending relating to the same victim.[2] She said with regard to those charges, however, that she had "never laid [her] hands on that lady." She also claimed that she had not had any contact with the victim since the incident. She thought she was currently controlling her anger very well and did not need anger management counseling. She conceded, however, that counseling "might" be beneficial to her, and said she was willing to comply with any conditions of probation the trial court might impose.

On cross-examination, the defendant acknowledged having gone in January or February to the victim's place of employment, a mobile home lot, but claimed that she had not known the victim worked there. She denied that she had gone to the lot more than once, or that she had made repeated telephone calls to the business. The defendant testified that she did not try to run the victim over with her car. She said she had not included any information about the victim's having had an affair with her husband in her counterclaim for divorce because she had not wanted to bring the information up.

At the conclusion of the sentencing hearing, the trial court found one "relatively minor" enhancement factor applicable: the defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, Tenn. Code Ann. § 40-35-114(1) (Supp. 2001), and no mitigating factors. The court noted that the defendant had previously been on a sentence involving release into the community, which had not been sufficient to prevent her from violating the law in the instant case. The trial court further found that the fact the defendant continued to maintain her innocence of the instant offense reflected unfavorably upon her suitability for probation. Therefore, the court denied her request for full probation, sentencing her as a Range I, standard offender to the minimum sentence of three years, with the sentence to be suspended and the defendant placed on probation after serving one year in the county workhouse. Following the denial of her motion for a new trial, the defendant filed a timely appeal as of right to this court, arguing that the evidence was insufficient to sustain her conviction and the trial court erred in denying full probation.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant first contends the evidence was insufficient to support her conviction, arguing that the conflicting testimony regarding whether the incident was intentional or accidental was sufficient to create reasonable doubt of her guilt. The State responds that the evidence, viewed in the light most favorable to the State, was more than sufficient for a rational trier of fact to have found

---

[2]The defendant's presentment charged her in seven separate counts with various offenses committed either alone or with Shelly Blanks against the same victim. Count three, charging the defendant with aggravated assault, and count four, charging her with reckless endangerment, were both based on the parking lot incident. These two counts were subsequently severed from the others, resulting in the trial in the instant case and the defendant's conviction for aggravated assault.

that the State proved the essential elements of the crime of aggravated assault beyond a reasonable doubt. We agree with the State.

When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The pertinent count of the presentment charged that the defendant "did unlawfully, feloniously, intentionally, and knowingly commit an assault as defined in T.C.A. 39-13-101 and with the use and/or display of a deadly weapon, to-wit: a motor vehicle, did cause [the victim] to reasonably fear imminent bodily injury, in violation of **T.C.A. 39-13-102, a Class C Felony**." Thus, to convict the defendant of aggravated assault, the State had to prove beyond a reasonable doubt that she intentionally or knowingly caused the victim to reasonably fear imminent bodily injury with the use or display of a deadly weapon. See Tenn. Code Ann. §§ 39-13-101(a)(2); -102(a)(1)(B) (1997). A deadly weapon is defined as "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tenn. Code Ann. § 39-11-106(a)(5)(B) (1997). A motor vehicle can be a deadly weapon. See State v. Tate, 912 S.W.2d 785, 787 (Tenn. Crim. App. 1995).

Here, there was ample evidence to show that the victim reasonably feared imminent bodily injury as a result of the incident, and the defendant apparently concedes that the State proved this element of her offense. Instead, she argues that her testimony that the incident occurred accidentally was sufficient to create reasonable doubt about her intent to commit the offense. We respectfully disagree. The jury could have reasonably inferred that the defendant acted either intentionally or knowingly from evidence that she threatened to kill the victim shortly before the incident and threatened her again immediately after narrowly missing her with the car; that she was stopped in her vehicle in front of the Kroger store when the victim started crossing the travel lanes and, in the victim's opinion, had to have accelerated quickly in order to reach her position; and that she was driving a rental car that the victim was unable to recognize. Viewed in the light most favorable to the State, the evidence showed the defendant deliberately drove her rental vehicle directly at the victim, causing her to reasonably fear imminent bodily injury. By using the vehicle in such a manner, she converted it into a deadly weapon. See Tate, 912 S.W.2d at 788 (concluding defendant can be convicted of aggravated assault with a deadly weapon if the State can show he or she intentionally or knowingly used motor vehicle to either inflict bodily injury on victim or cause victim to reasonably fear imminent bodily injury). We conclude, therefore, that the evidence was sufficient to sustain the defendant's conviction for aggravated assault.

## II. Sentencing

The defendant next contends the trial court erred in ordering that she serve one year of her three-year sentence in confinement, instead of granting her full probation. When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Scott, 735 S.W.2d 825, 829 (Tenn. Crim. App. 1987).

The party challenging the sentences imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. In this case, the defendant has the burden of illustrating the sentence imposed by the trial court is erroneous.

As a Range I, standard offender convicted of a Class C felony, the defendant was subject to a sentence ranging from three to six years. See Tenn. Code Ann. § 40-35-112(a)(3) (1997). The sentence to be imposed by the trial court for a Class C felony is presumptively the minimum in the range when there are no enhancement or mitigating factors present. Id. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. Id. § 40-35-210(d), (e). The weight to be afforded an applicable factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. Id. § 40-35-210, Sentencing Commission Comments; State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

Because the defendant's presentence report reflects three prior misdemeanor convictions in 1994, we conclude that the trial court did not err in finding enhancement factor (1) applicable, or in assigning it minimal weight. We further conclude that the trial court did not err in finding no mitigating factors applicable in this case. We note, however, that the defendant's sentence is already the minimum in the range, as the trial court apparently found enhancement factor (1) carried too little weight to justify enhancing the defendant's sentence from the presumptive minimum of three years.

The defendant contends the trial court should have granted her full probation, given her history and background and the unusual circumstances of her crime, which included her belief that the victim was having an affair with her husband. However, although the trial court was required to consider probation in this case, the defendant was not automatically entitled to receive it as a matter of law. See Tenn. Code Ann. § 40-35-303(b) (1997). The burden is upon the defendant to show that she is a suitable candidate for probation. Id.; State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. Bingham, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. Goode, 956 S.W.2d at 527. The trial court may also appropriately consider the defendant's candor and willingness to accept responsibility for his or her actions when considering whether probation should be granted, as these reflect upon the defendant's potential for rehabilitation. See State v. Nunley, 22 S.W.3d 282, 289

(Tenn. Crim. App. 1999); <u>State v. Zeolia</u>, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996); <u>State v. Dowdy</u>, 894 S.W.2d 301, 306 (Tenn. Crim. App. 1994).

We conclude that the trial court did not abuse its discretion in denying the defendant full probation in this case. The defendant's refusal to accept responsibility for her crime is clearly demonstrated by the official version of the incident she provided for her presentence report and her testimony at the sentencing hearing, in which she asserted that the incident did not happen and that the victim fabricated the allegation against her. The defendant also failed to express any remorse for her actions and never genuinely acknowledged that she needed anger management counseling. Moreover, she seemed to imply that it was she, rather than the victim, who had been wronged, testifying, "I am controlling my anger very well, I think. I am not mad about anything. I just really want to be left alone." The defendant denied that she had harassed the victim after the incident by purposely going to her place of employment or making repeated phone calls to the business, claiming that it had been a coincidence that she had gone to purchase a mobile home at the lot where the victim worked. In sum, the defendant's testimony throughout her sentencing hearing demonstrated a lack of candor and remorse and a complete failure to accept responsibility for her crime. We conclude, therefore, that the defendant has failed to show that the trial court improperly denied her request for full probation, under the facts and circumstances that existed in this case.

## CONCLUSION

Having thoroughly reviewed the record, we conclude that the evidence was sufficient to support the defendant's conviction and the trial court did not err in denying the defendant full probation. Accordingly, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE